State of WYOMING, Plaintiff,

and

Timothy J. Morrison, Marie A. Fontaine, and Tim A. French, in their official capacity as the Board of County Commissioners of the County of Park, State of Wyoming, Plaintiff–Intervenors,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR; United States Fish & Wildlife Service; Gale Norton, in her capacity as the Secretary of the United States Department of the Interior; Steven Williams, in his official capacity as the Director of the United States Fish & Wildlife Service, Defendants,

and

Greater Yellowstone Coalition, National Wildlife Federation, Jackson Hole Conservation Alliance, Predator Conservation Alliance, and Wyoming Outdoor Council, Defendant–Intervenors.

Wyoming Wool Growers Association; Wyoming Stock Growers Association; Wyoming Farm Bureau Federation; Wyoming Association of Conservation Districts; Rocky Mountain Farmers Union; Wyoming County Commissioners Association; Board of County Commissioners of the County of Campbell; Board of County Commissioners of the County of Lincoln; Board of County Commissioners of the County of Sublette; Board of County Commissioners of the County of Washakie; Wyoming Association of County Predatory Animal Boards; Fremont County Predatory Animal Board; Teton County Predatory Animal Board; Converse County Predatory Animal Board; Wyoming Outfit-

ters & Guides Association; Green River Valley Cattlemen's Association; Upper Green River Cattle Association; Wyoming Business Alliance; Cody Country Outfitters and Guides Association; Foundation for North American Wild Sheep; Jackson Hole Outfitters and Guides; Rock Springs District 4 Grazing Board; Sportsmen for Fish & Wildlife, Wyoming; Sportsmen for Fish & Wildlife, Park County; Sportsmen for Fish & Wildlife, Teton County; Sportsmen for Fish & Wildlife, Lincoln County; and Sportsmen for Fish & Wildlife, Utah, Plaintiffs,

v.

United States Department Of The Interior; United States Fish & Wildlife Service; Gale Norton, in her capacity as the Secretary of the United States Department of the Interior; Steven Williams, in his official capacity as the Director of the United States Fish & Wildlife Service; Ralph Morgenweck, in his official capacity as the Regional Director of Region Six for the United States Fish & Wildlife Service Defendants,

and

Sierra Club and Natural Resources Defense Council, Defendant–Intervenors.

No. 04–CV–0123–J, 04–CV–0253–J.

United States District Court, D. Wyoming.

March 18, 2005.

Jay A. Jerde, Water & Natural Resources Division, Wyoming Attorney General's Office, Patrick Crank, Wyoming Attorney General, Cheyenne, WY, for Plaintiff(s) (04–CV–0123–J).

Harriet M. Hageman, Hageman & Brighton, Cheyenne, WY, for Plaintiff(s) (04–CV–253–J).

Bryan Skoric, Park County & Prosecuting Attorney, Cody, Jim F. Davis, Park County Attorney's Office, Powell, WY, for Plaintiff–Intervenors (04–CV–123–J).

Jimmy A. Rodriguez and Kristen L. Gustafson, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for Federal Defendants (04–CV–123–J and 04–CV–253–J).

Jack Tuholske, Tuholske Law Office, Missoula, MT, for Intervenor–Defendants (04–CV–123–J).

Abigail M. Dillen and Douglas L. Honnold, Earthjustice Legal Defense, Bozeman, MT, Timothy C. Kingston, Graves, Miller & Kingston, Cheyenne, WY, for Intervenor–Defendants (04–CV–253–J).

## MEMORANDUM OPINION AND ORDER

ALAN B. JOHNSON, Chief Judge.

The above-entitled matter comes before the Court on plaintiffs State of Wyoming,

et al.'s Opening Briefs. The Court, having reviewed the briefs, administrative record and materials filed in support thereof and in opposition thereto, having heard oral arguments on February 4, 2005, and being otherwise fully advised in the premises, **FINDS** and **ORDERS** as follows:

### Factual and Procedural Background

By the early 1900s the demographic collapse of the gray wolf in the western portion of the United States was at its apex. Nearly the entire population of gray wolves had disappeared. The near extermination of the gray wolf had many causes, including westward expansion of the population of the United States, rampant hunting and anti-wolf government policies.[1] It is generally accepted that the cause of the wolf's demise in the coterminous United States was a direct result of human depredation.

In 1973, United States Fish and Wildlife Services (FWS) listed the Northern Rocky Mountain Wolf (*Canis lupus irremotus*) as an endangered species pursuant to its authority under the Endangered Species Act, 16 U.S.C. §§ 1531, *et seq.* (ESA). In 1978, the Secretary revised the gray wolf listing to include the entire species *canus lupus*. 43 Fed.Reg. 9,607 (March 9, 1978). In 1980 the FWS developed a plan (the Recovery Plan) to recover the gray wolf population in the northern Rocky Mountain area, encompassing Yellowstone Park north to the Canadian border, including areas of central Idaho. The Recovery Plan envisioned gray wolf reintroduction in Yellowstone National Park. The goal of the Recovery Plan was to coordinate recovery of two viable gray wolf populations in the lower forty-eight states. No action was taken on this plan.

In 1982 Congress amended the ESA to include Section 10(j).[2] This section of the ESA authorizes the Secretary of the Interior to relocate and "release...any population...of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such a release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A). Before any authorization of a release of an endangered species the Secretary must determine if the released population "is essential to the continued existence of an endangered species or a threatened species." 16 U.S.C. § 1539(j)(2)(B).

In 1987, FWS revised the 1980 Recovery Plan (the Revised Plan). In the Revised Plan the FWS proposed steps to remove the gray wolf from the endangered and threatened species list. The Revised Plan covered three major geographic areas: northwest Montana, central Idaho, and the Greater Yellowstone Area. The Revised Plan further recommended the introduction of at least ten breeding pairs of gray wolves for three consecutive years into those areas. The Revised Plan proposed a metric by which the Recovery Plan could be evaluated as a success, namely the establishment of 10 breeding pairs of wolves for at least three years in the three outlined recovery areas. The Revised Plan also recommended that once the gray wolf population recovered, the recovery area should be split into three management zones to be administered by the respective states, Montana, Idaho and Wyoming.

In 1991, based on the Revised Plan, Congress directed the FWS, in cooperation with the National Park Service and the United States Forest Service, to prepare

---

**1.** The human-wolf dynamic has a sordid history that is by no means a modern issue. The ancient Greeks offered bounties on wolves. Europeans also harbored animosity toward wolves, an animosity brought over to North America by the early European settlers. *See* Aesop, *The Wolf in Sheep's Clothing,* circa 7th century B.C.E.

**2.** 16 U.S.C. § 1539(j)

an environmental impact statement discussing the impact of introducing gray wolf populations into Yellowstone Park and central Idaho, in accordance with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* (NEPA). *See* 42 U.S.C. § 4332(C)(i). On May 4, 1994, FWS filed the final environmental impact statement (FEIS) regarding the reintroduction of gray wolf populations into the two recovery areas. No supplemental environmental impact statement was filed.[3]

In November 1994, the United States Department of Interior (Interior) promulgated a rule, 50 C.F.R. § 17.84(i)(the Final Rule), authorizing the introduction of experimental, non-essential gray wolf populations into Yellowstone Park and central Idaho. The term non-essential refers to the fact that the released population was not essential to the survival of the species as a whole. Two reintroduction areas were specified in the Code of Federal Regulations. *See* Figure 1. Management of the reintroduced gray wolf populations is controlled under 50 C.F.R. § 17.84(i). This section provides a comprehensive management strategy regarding the reintroduced gray wolves. Included in the regulation are rules regarding controlling gray wolves that attack or deprecate livestock and the wild ungulate population.[4] *See* 50 C.F.R. §§ 17.84(i)(3),(7), and (8). The management plan provides for both self-help management of wolf depredation,

federal agency action, and action by the states and affected tribes. The self-help provisions refer to livestock producers on both public lands and private lands, and approves methods for the harassment and taking of gray wolves that are depredating livestock.

**Figure 1.** The Yellowstone Management Area. (50 C.F.R. § 17.84(7)(ii)

In 1995, the FWS began the reintroduction of the gray wolf into Yellowstone Park and the surrounding environs. The FWS' initial release included fourteen western Canadian gray wolves. FWS released seventeen additional western Canadian gray wolves one year later.[5] Concomitant with

---

3. This is the gravamen of the Wolf Coalition's NEPA argument. The Wolf Coalition argues that NEPA required the FWS to file a subsequent environmental impact statement to address the increased range of the gray wolf.

4. Un•gu•late (un′gyoo-lit) [L., unguis, a hoof; -atus suffix meaning provided with] n. a mammal having hoofs. Substantial populations of North American bison, elk, moose and deer are found in Wyoming.

5. Litigation followed the release of the gray wolves. *See Wyoming Farm Bureau Fed'n v. Babbitt,* 987 F.Supp. 1349 (D.Wyo.1997),

*rev'd and remanded by* 199 F.3d 1224 (10th Cir.2000). This case centered around three separate challenges to the DOI's final rules governing the reintroduction of a nonessential experimental population of gray wolves into Yellowstone National Park and central Idaho. The district court struck down the challenged rules as violative of section 4(f) and section 10(j) of the ESA, 16 U.S.C. §§ 1533(f), 1539(j). However, the district court found no violation of the National Environmental Policy Act (NEPA). Reversing the district court, the Tenth Circuit concluded that the department of interior was entitled to interpret the

the reintroduction of the gray wolves, the FWS announced that the gray wolf would be a candidate for delisting or downlisting when the population met or exceeded the recovery goals outlined in their Revised Plan. *See* 50 C.F.R. § 17.84(i)(9). In fact, in 2003 the FWS downlisted the gray wolf within the western Distinct Population Segment (DPS) from endangered to threatened. *See* 68 Fed.Reg. 15,806–15,-875. The FWS, looking to the eventual delisting of the gray wolf in light of its remarkable recovery, requested that Idaho, Montana and Wyoming each develop a wolf management plan that would assure further success and advance the goals of the Revised Plan and comport with the ESA's mandates regarding the delisting of the gray wolf and the existence of a sustainable gray wolf population. *See* 16 U.S.C. § 1533(a)(1). To this end, each state began to develop a wolf management plan. This process included input and suggestions from FWS along the way.[6]

On July 16, 2002, FWS sent a letter to then acting director of the Wyoming Game and Fish Department (WGFD) outlining issues FWS considered necessary to be addressed before delisting could occur. These issues included concern about Wyoming's classification of the gray wolf as a predator. FWS explained that the law would have to change in order to pass muster under the ESA's delisting regulations. On September 11, 2002, the WGFD wrote the FWS a letter inquiring whether a dual status approach to wolf management would satisfy the requirements, as FWS saw them, for delisting. The dual status proposal would regulate the gray

wolf, under Wyoming law, as both a predator and a trophy game animal.

On September 26, 2002, FWS replied to WGFD inquiry regarding a dual status approach to regulation of the gray wolf. FWS wrote that it did not believe that the dual status approach would satisfy their requirements for maintaining a viable gray wolf population. The FWS suggested that Wyoming contact Montana and Idaho to help develop a unified approach to state wolf management.

On December 2, 2002, FWS sent WGFD comments on the proposed Wyoming wolf management plan. In his comments, Ed Bangs, FWS Wolf Recovery Coordinator, reiterated FWS's concern regarding the dual status approach. Mr. Bangs, however, thought that the plan otherwise had a sound biological basis.

On February 21, 2003, DOI sent Governor Freudenthal a letter discussing Wyoming's wolf management plan and how it needed to fit within the ESA's requirements for delisting. In that correspondence, DOI highlighted the number of packs required to be sustained outside of Yellowstone National Park and the need for a regulated harvest of gray wolves.

On July 2, 2003, FWS, through Ed Bangs, made comments on the final draft of Wyoming's wolf management plan. Mr. Bangs reiterated FWS and DOI's mutual concern regarding the classification of gray wolves as predators.

In July 2003, the Wyoming Legislature enacted Wyo. Stat. § 23–1–304. This legislation established a wolf management plan for Wyoming (the Wyoming Plan).

---

phrase, "wholly separate geographically from nonexperimental populations" according to its discretion, and the fact that there was some overlap of experimental and nonexperimental populations of wolves did not make reintroduction of wolves violative of the Endangered Species Act. The Tenth Circuit

Court of Appeals affirmed that the DOI had not violated NEPA in the reintroduction of wolves.

6. A significant proportion of the Administrative Record consists of written correspondence between the state and federal entities.

The Wyoming Plan becomes effective upon the removal of the gray wolf from the list of experimental nonessential population, endangered species or threatened species in Wyoming. Wyo. Stat. § 23–1–304(f); *see also* Wyo. Stat. § 23–1–108. The goal of the legislation was to have a management plan in place to facilitate the delisting of the gray wolf. A statement of legislative intent provided:

(a) It is the purpose of this act, unless the introduction of the gray wolf into Wyoming is determined by lawful authorities not to have been in accordance with federal law, to provide appropriate state management and control of gray wolves in order to facilitate the removal of the gray wolf from its listing as an experimental nonessential population, endangered species or threatened species in Wyoming and to prevent future listing of the gray wolf as an experimental nonessential population, endangered species or threatened species.

(b) In providing appropriate state management and control of gray wolves, the state acknowledges the need to fill the current vacuum of management of this species within the state. The state retains all rights to investigate and, if determined by state officials to be appropriate, take legal actions against the federal government relating to the introduction of the gray wolf into the boundaries of this state.

(c) In order to accomplish the purposes of this act, the game and fish commission shall enter into a memorandum of understanding with appropriate federal agencies under which the commission and federal agencies shall endeavor to manage the prey base for gray wolves in a manner to maintain a sufficient prey base in Yellowstone National Park, Grand Teton National Park and John D.

Rockefeller, Jr. Memorial Parkway within the state for at least eight (8) packs of wolves. The game and fish commission shall endeavor to manage big game populations providing a prey base for seven (7) packs of gray wolves in all other areas of the state in such a manner as to mitigate to the greatest extent possible, adverse effects on opportunities for licensed hunters to take big game.

Laws 2003, ch. 115, § 3.

The Wyoming Plan is a comprehensive management strategy, with several key provisions. The Wyoming Plan classifies gray wolves as both predatory and trophy game animals. *See* Wyo. Stat. §§ 23–1–101(a)(viii) and (xii)(B)(I & II). Wyoming Statute § 23–1–101(a)(viii)(B) provides:

(B) Until the date gray wolves are removed from the list of experimental nonessential population endangered species or threatened species in Wyoming as provided by W.S. 23–1–108, "predatory animal" includes wolves. After that date, "predatory animal" shall include any gray wolf not within an area of the state in which the gray wolf is:

(I) Designated as a trophy game animal under subdivision (xii)(B)(I) of this subsection;

(II) Classified as a trophy game animal by the commission pursuant to W.S. 23–1–304(b)(i)(A).[7]

Classification as a predatory animal is significant because the management is less regulated than other game classifications. For instance, Wyoming Statute § 23–3–103 provides:

(a) Predatory animals and predacious birds may be taken without a license in any manner and at any time except as provided by W.S. 23–2–303(d), 23–3–112, 23–3–304(b), 23–3–305 and 23–3–307. The department shall report annually to

---

**7.** Coyotes, jackrabbits, porcupines, raccoons, red foxes, skunks and stray cats are also classified as predatory animals pursuant to Wyo. Stat. § 23–1–101(a)(viii)(A).

the Wyoming department of agriculture the number of predatory animals and predacious birds taken by the department's animal damage control agents, and include in the report the area where taken and the control method used.

The classification of the gray wolf as a predatory animal is premised on there being "at least seven [ ] packs of gray wolves located in this state and primarily outside of Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway or at least fifteen [ ] packs within this state, including Yellowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway as of the end of the preceding calendar quarter." Wyo. Stat. § 23–1–304(b)(ii). However, under the Wyoming Plan gray wolves would also be managed under a "trophy game animal" classification. Wyoming Statute § 23–1–101(a)(xii)(B) provides:

(B) From and after the date gray wolves are removed from the list of experimental nonessential population, endangered species or threatened species in Wyoming as provided by W.S. 23–1–108:

(I) "Trophy game animal" shall include any gray wolf within those tracts of land within the boundaries of Wyoming designated as Yellowstone National Park, Grand Teton National Park, the John D. Rockefeller, Jr. Memorial Parkway, and those federally designated wilderness areas contiguous to these national parks and this parkway as defined by the United States Congress as of January 1, 2003; and

(II) "Trophy game animal" shall include any gray wolf within any area of the state where gray wolves are classified as trophy game animals by the commission pursuant to W.S. 23–1–304(b)(i)(A).[8]

Management of trophy game animals is more regulated than predatory animals. For instance, Wyoming Statute § 23–3–102(b) and (c) provides:

(b) Any person who takes any bighorn sheep, mountain goat, mountain lion, grizzly bear or, gray wolf where classified as a trophy game animal, without the proper license except as otherwise permitted by this act is guilty of a 4th degree misdemeanor.

(c) Any person who takes any big or trophy game animals not specified in subsections (a) and (b) without a proper license except as otherwise permitted by this act is guilty of an 8th degree misdemeanor.

The principal difference between the classification between predatory animal and trophy game animal is that an animal classified as a predatory animal may be taken at any time without a license or coupon, whereas the taking of an animal classified as a trophy game animal without a license is subject to criminal sanction.[9] However, the Wyoming Plan specifically calls for the commission to prohibit the taking of gray wolves except when the gray wolves are damaging private property, "within the area of the state the commission determines is necessary to reasonably ensure seven [ ] packs of gray wolves are located in this state and primarily outside of Yel-

---

8. Black Bears, grizzly bears and mountain lions are classified as trophy game animals pursuant to Wyo. Stat. § 23–1–101(xii)(A).

9. Wyo. Stat. § 23–3–103 provides an exception to taking trophy game animals without a license. Pursuant to that section the commis-

sion, under Wyo. Stat. § 23–1–302(a)(ii), may specify areas where trophy game animals may be taken without a license. Also, Wyo. Stat. § 23–3–115 provides for the taking of gray wolves damaging private property by the owner of the property, employee of the owner or lessee of the property.

lowstone National Park, Grand Teton National Park and John D. Rockefeller, Jr. Memorial Parkway at the end of the current calendar year." Wyo. Stat. § 23–1–304(b)(i)(A); *see also* Wyo. Stat. § 23–3–115(c)(dealing with the management of gray wolves that destroy private property).

Another key feature of the Wyoming Plan is how it defines pack. The Wyoming Plan defines "pack" as meaning:

> five (5) or more gray wolves traveling together. If a group of gray wolves consists of more than ten (10) animals known to be traveling together, the commission may, at its discretion, recognize the number of packs within such a group to be equal to the number of reproductively mature females bearing young found within that group of wolves.

Wyo. Stat. § 23–1–304(c).

In September 2003, Wyoming submitted the Wyoming Plan to FWS for approval. Idaho and Montana each submitted proposed wolf management plans as well. In January 2004, after peer review, the FWS approved the proposals from Idaho and Montana, however, rejected the Wyoming Plan. In a letter sent to the WGFD, the DOI wrote:

> Based on our review of the state management plans, peer review comments, and the states' response to those comments, the [FWS] is confident that both the Montana and Idaho wolf management plans are adequate to maintain their share of the tri-state wolf population above recovery levels. Nonetheless, the [FWS] must consider the three state management plans in their totality because the wolf populations of the three states comprise the Western Distinct Population Segment, the listed entity in question. As a result, delisting cannot be proposed as this time due to some significant concerns about portions of Wyoming's state law and wolf management plan.

Several points of contention emerged between FWS, DOI and the State of Wyoming. Chief among them was Wyoming insistence on maintaining a "predatory animal" classification for gray wolves. In the January 13, 2004 letter the DOI commented:

> [t]he 'predatory animal' status for wolves must be changed. The unregulated harvest and inadequate monitoring plan, and unit boundaries proposed by the state's management plan do not provide sufficient management controls to assure [FWS] that the wolf population will remain above recovery levels.

The DOI suggested in that same letter that "[t]he designation of wolves as 'trophy game' statewide would allow Wyoming to devise a management strategy that provides for self-sustaining populations above recovery goals, regulated harvest and adequate monitoring of that harvest."

FWS and Interior were also concerned about Wyoming's commitment to managing at least fifteen wolf packs in Wyoming. In the January 13, 2004 letter the DOI noted:

> The Wyoming state law must clearly commit to managing for at least 15 wolf packs in Wyoming. [DOI] believe[s] that wolf population management as trophy game would provide adequate controls to ensure that wolves remain above recovery goals with well distributed packs in suitable habitat.

DOI also took issue with Wyoming's definition of pack. The DOI explained its position in the letter, stating:

> The Wyoming definition of a pack must be consistent among the three states and should be biologically based...If pack size must be established by law...the state law must define pack size as at least 6 wolves traveling together in the winter. At the current time, biological monitoring and analyses

indicate that this pack size is expected to include at least one breeding pair.

Since having wolf management plans in place was a prerequisite to delisting the gray wolf from the ESA, Interior and FWS have not yet proposed a rule to delist the gray wolf. However in April 2003, the FWS did propose and promulgate a rule that downlisted the gray wolf in the Western and Eastern Distinct Population Segments.[10] *See* 68 Fed. Register 15,804.

On May 3, 2004, the State of Wyoming filed suit in the United States District Court for the District of Wyoming against Gale Norton in her official capacity as the Secretary of the United States Department of Interior and Steven Williams in his official capacity as the Director of FWS.[11] On July 22, 2004, Timothy Morrison, Marie French and Tim French moved to intervene on behalf of the State of Wyoming in their official capacities as the Board of County Commissioners of the County of Park, State of Wyoming-the motion was granted on July 26, 2004. On August 5, 2004, the Greater Yellowstone Coalition, the National Wildlife Federation, the Jackson Hole Conservation Alliance, the Predator Conservation Alliance and the Wyoming Outdoor Council moved to intervene on behalf of the U.S. Depart-

ment of Interior-this motion was granted on the same day it was filed.

The State of Wyoming and the Plaintiff–Intervenors alleged several causes of action, including: (1) that the Defendants have violated the ESA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (APA), in their rejection of the Wyoming Plan by ignoring the best scientific and commercial data available, and by relying instead upon "litigation risk management" and political concerns; (2) that the Defendants violated the FWS' own mandates by failing to properly manage and control depredating wolves in Wyoming; and (3) that Defendants have violated the Commerce Clause, the Tenth Amendment, and the Guarantee clause of the United States Constitution. On September 28, 2004 this Court issued a pretrial order establishing briefing schedules and deadlines.[12]

On September 21, 2004, the Wolf Coalition filed suit in the United States District Court for the District of Wyoming naming the Department of the Interior and FWS as defendants in the United States District Court, District of Wyoming.[13] The Wolf Coalition consists of several groups including state and local governmental bodies, agricultural advocates, environmental groups and outdoor sporting groups.[14] On

---

10. This final rule was partially vacated in *Defenders of Wildlife, et al. v. Secretary United States Department of the Interior et al.,* 354 F.Supp.2d 1156 (D.Ore.2005).

11. Docket No. 04–CV–0123–J

12. The Plaintiffs' initial briefs were due on November 29, 2004, a response was due on January 10, 2005, and the Plaintiffs' reply is due on January 24, 2005.

13. Docket No. 04–CV–0253–J

14. The Wolf Coalition includes: Wyoming Wool Growers Assoc., Wyoming Stock Growers Assoc., Wyoming Farm Bureau Federation, Wyoming Assoc. of Conservation Dis-

tricts, Rocky Mountain Farmers Union, the Wyoming County Commissioners Assoc., Board of County Commissioners of the County of Campbell, Board of County Commissioners of the County of Lincoln, Board of County Commissioners of the County of Sublette, Board of County Commissioners of the County of Washakie, Wyoming Assoc. of County Predatory Animal Boards, Fremont County Predatory Animal Board, Teton County Predatory Animal Board, Converse County Predatory Animal Board, Wyoming Outfitters & Guides Assoc., Green River Valley Cattlemen's Assoc., Upper Green River Cattle Assoc., Wyoming Business Alliance, Cody Country Outfitters and Guides Assoc., Foundation for North American Wild Sheep, Jackson Hole Outfitters and Guides, Rock Springs Dis-

November 8, 2004, the Sierra Club and Natural Resources Defense Council moved to intervene on behalf of the Defendants-their motion was granted the same day.

The Wolf Coalition asserts, based on the facts enumerated above, several claims: (1) that the Defendants have violated the ESA and APA in their rejection of the Wyoming Plan by failing to consider the best scientific and commercial data available; (2) that Defendants violated the ESA, APA and NEPA by failing to manage and control the gray wolf population in Wyoming; (3) that the Defendants have violated NEPA by failing to prepare a Supplemental Environmental Impact Statement to address the impact of wolf populations outside of the Greater Yellowstone Area, and by requiring the State of Wyoming to adopt a wolf management plan that would require, encourage, support or manage gray wolves in areas located outside of the recovery area defined and studied in the Revised Plan, the FEIS and the Final Rule. The Wolf Coalition claims that it is entitled to declaratory and injunctive relief on all counts alleged, including a mandate that the Defendants comply with the ESA, NEPA and APA.

On October 21, 2004, the Wolf Coalition moved pursuant to Fed.R.Civ.P. 42(a) and U.S.D.C.L.R. 42.1 to consolidate the case of *Wyoming Wool Growers Assoc. et al. (Wolf Coalition) v. United States Dept. of the Interior et al. and Sierra Club, et al.,* Docket No. 04-CV-0253J with *State of Wyoming et al. v. United States Dept. of Interior et al. and Greater Yellowstone Coalition et al.,* Docket No. 04-CV-0123-J. On November 18, 2004, this Court consolidated the two cases, and bifurcated the action into two distinct phases. The first round of briefing, with which we are now confronted, was limited to the Plaintiffs'

claims arising under the APA, and the Constitution of the United States. The Court also directed the Defendants to raise any jurisdictional claims in the first round of briefing. The second round of briefing, if needed, will address the merits of the Plaintiffs' claims that the federal Defendants have failed to manage livestock and wild ungulate depredations attributed to the gray wolf population.

## Standard of Review

■ The APA governs the review of the Plaintiffs' and Plaintiff–Intervenors' causes of action arising under the ESA. Under the APA, the reviewing court must set aside agency actions that are " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)(quoting 5 U.S.C. § 706(2)(A)). The Tenth Circuit has held: the essential function of judicial review is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion. *CF & I Steel Corp. v. Economic Dev. Admin.,* 624 F.2d 136, 139 (10th Cir.1980); *American Petroleum Inst. v. EPA,* 540 F.2d 1023, 1029 (10th Cir. 1976) (citing Overton Park, 401 U.S. at 415–17, 91 S.Ct. 814). Legal principles applicable in the first two determinations are straightforward. Determination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consider-

trict 4 Grazing Board, Sportsmen for Fish & Wildlife, Wyoming, Sportsmen for Fish & Wildlife, Park County, Sportsmen for Fish &

Wildlife, Teton County, Sportsmen for Fish & Wildlife, Lincoln County, and Sportsmen for Fish & Wildlife, Utah.

ation of whether on the facts, the agency's action can reasonably be said to be within that range. *Overton Park,* 401 U.S. at 415–16, 91 S.Ct. 814. Determination of whether the agency complied with prescribed procedures requires a plenary review of the record and consideration of applicable law. *See id.* at 416–17, 91 S.Ct. 814.

*Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1574 (10th Cir., 1994).

### Discussion

#### a. Plaintiffs' APA Claims

■ Plaintiffs allege that the Federal Defendants acted arbitrarily and capriciously when they rejected the Wyoming Plan. *See* 5 U.S.C. § 706(2)(A). Specifically, the Plaintiffs argue that the Federal Defendants violated mandates within the ESA that the Defendants rely solely on the "best science available." *See* 16 U.S.C. § 1533(b)(1)(A); *and* 50 C.F.R. § 424.11(b). Plaintiffs allege standing under the ESA's citizen-suit provision. *See* 16 U.S.C. § 1540(g)(1)(C). Namely the Plaintiffs argue that the Federal Defendants have failed to perform a non-discretionary act by rejecting the Wyoming Plan on the basis other than the "best science available." As such the Plaintiffs claim that the Court has jurisdiction to review the Federal Defendants' actions pursuant to the APA's judicial review provision § 706, alleging that the Federal Defendants have both acted arbitrarily and capriciously and have "unlawfully withheld or unreasonably delayed" agency action.

The Federal Defendants argue that the Court does not have jurisdiction under the APA, thus there is no basis for the Court to set aside and/or compel agency action. Specifically, the Federal Defendants point out that there has not been a "final agency action" to review. *See* 5 U.S.C. § 551(13). Furthermore, the Federal Defendants contend that the Court is not presented with a failure of the agency to take a discrete, required action. The Federal Defendants also argue that the Plaintiffs have not availed themselves of the statutory mechanisms by which to petition the DOI and FWS to delist the gray wolf. *See* 16 U.S.C § 1533(b)(3)(A)-(C); 50 C.F.R. § 424.14. The Federal Defendants further assert that the purported "rejection" of the Wyoming Plan was not an agency action, under the legal definition of the concept. *See generally Norton et al. v. Southern Utah Wilderness Alliance et al.,* 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) [hereinafter *SUWA* ].

Plaintiffs allege that the letter sent by FWS to Wyoming on January 13, 2004, notifying the Plaintiffs of the deficiencies within the Wyoming Plan constituted final agency action for purposes of the APA. The Plaintiffs claim that the Defendants' letter presented them with a "Hobson's choice-make the demanded changes or [ ] seek legal redress for the illegal rejection of the Wyoming Plan."[15] The Plaintiffs also claim that the Federal Defendants' rejection of the Wyoming Plan will have "permanent and significant effects on Wyoming's other wildlife resources." Furthermore, the Plaintiffs claim that the letter marked the consummation of the decision making process because it was neither tentative nor inter-

---

**15.** Hobson's choice *HOB-sunz-chois*, noun: A choice without an alternative; the thing offered or nothing. The most famous example of a Hobson's choice comes from Henry Ford when discussing the Model T, saying "you can have it in any color as long as its black." It is obvious from the facts and the Plaintiffs' own briefs that the Plaintiffs had several choices to make, thus the Defendants did not offer the Plaintiffs a Hobson's choice. The Plaintiffs were free to revise the Wyoming Plan to comport with the Plaintiffs' concerns, petition the agency to delist the gray wolf under the ESA, seek legal redress, seek Congressional redress, or accept the status quo.

locutory in nature. The Plaintiffs further argue that the mandatory nature of the letter's language compelling Wyoming to amend certain aspects of the Wyoming Plan demonstrates that the Defendants' decision on the matter was foreclosed to further deliberation. The Plaintiffs also argue that the rejection determines its legal rights and obligations insofar as the delay caused by not delisting infringes upon Wyoming's sovereignty by preventing Wyoming from assuming management authority over the gray wolves living within the frontiers of Wyoming itself.

The Defendants counter that the letter was simply one step in a multi-faceted decision of whether to propose delisting or not, thus it cannot be considered final. The Defendants also note that the letter has not determined the "rights and obligations" of the Plaintiffs. The Defendants argue that the letter simply provides recommendations to address the concerns of FWS regarding the adequacy of the Wyoming Plan. Furthermore, the Defendants claim that the letter did not change the status quo, thus cannot be properly characterized as final agency action. The Defendants also assert that the only action in a determination not to delist a species under the ESA would come after a petition had been filed pursuant to 50 C.F.R. § 424.14. The Defendants argue that the letter is properly characterized as an interlocutory decision bearing on only one aspect of the delisting process.

 To satisfy the statutory requirements for judicial review under the APA, a plaintiff must establish that the challenged action is "final agency action." *Colorado Farm Bureau Fed'n v. United States Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000). The APA defines "agency action" as: "includ[ing] the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act[.]" 5 U.S.C. § 551(13). To be considered final agency action, for the purposes of the APA, "two conditions must be satisfied for an agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process...it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights and obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). Plaintiffs have the burden of identifying specific federal conduct and explaining how it is "final agency action" within the meaning of 5 U.S.C. § 551(13). *Colorado Farm Bureau Fed'n*, 220 F.3d at 1173 (citations omitted).

In determining whether the letter in question is final agency action, for purposes of the APA, the text of the letter is quite instructive. The letter contains the following: "If requested, the [FWS] will assist the [Wyoming] Department [of Fish & Game] in implementing the three changes noted above." This sentence obviously contemplates more cooperation between Wyoming and the Federal Defendants. The language is interlocutory in nature, and not the culmination of a decision-making process-such as whether to delist the wolf. *See Colorado Farm Bureau Fed'n*, 220 F.3d at 1174. The letter also contemplates Wyoming working with FWS biologists "to prepare a proposal to delist wolves when adequate management plans are approved." Thus demonstrating that the approval, or rejection of the Wyoming Plan was not the penultimate decision or action to be made for delisting the gray wolf. It is well settled that the decision to de-list includes five categories-the January 13 letter covers only one of those categories. *See* 16 U.S.C. §§ 1533(a)(1)(A-E).

The Plaintiffs and Plaintiff–Intervenors argue that the Federal Defendants failed

to apply the "best science available" mandate when they rejected the Wyoming Plan. The Plaintiffs and Plaintiff–Intervenors point to the January 13, 2003 letter as establishing the Federal Defendants' illegal determination that the Wyoming Plan was inadequate to preserve the recovered population of gray wolves within the borders of Wyoming. The Plaintiffs and Plaintiff–Intervenors assert that the Federal Defendants' failure to use the best science available standard was arbitrary and capricious under 5 U.S.C. § 706(2)(A). The Plaintiffs ask this Court to reverse the determination of the Federal Defendants and to force them, through an injunction, to propose a delisting of the gray wolf.

The Federal Defendants deny that they were under a mandatory duty to apply the best science available mandate to the decision contained in the letter. The Federal Defendants argue that the decision did not come under the guise of a status review, or as an agency response to a petition to delist the species. Thus, the mandate contained within the statute does not apply to the decision reached by the agency in the letter.

The best science available standard is not a general mandate to the Federal Defendants. In fact, the standard only applies to discrete statutory and regulatory decisions entrusted to the Federal Defendants. *See* 50 C.F.R. § 424.14 (petition); *and* 50 C.F.R. § 424.21. The mandate itself provides:

> The Secretary shall make determinations required by subsection (a)(1) solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation,

to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

16 U.S.C. § 1533(b)(1)(A).

The determinations that the Secretary is required to make are:

> The Secretary shall by regulation promulgated in accordance with subsection (b) determine whether any species is an endangered species or a threatened species because of any of the following factors:
>
> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C) disease or predation;
>
> (D) the inadequacy of existing regulatory mechanisms; or
>
> (E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1).

The regulations promulgated by the Secretary include two basic mechanisms that trigger a determination to change the status of a species: petition or status review. Thus, the "best science available" mandate would only attach to the Federal Defendants' decision contained in the January 13, 2004 letter as a result of a status review or petition to delist.

Both parties agree that neither the Plaintiffs nor the Plaintiff–Intervenors filed a petition to delist the gray wolf. Indeed, at oral argument the Plaintiffs were adamant that such a requirement would elevate form over function. The Plaintiff–Intervenors argued that filing a petition would be futile because they already knew what determination the Federal Agencies involved would make.[16] These

---

**16.** This is a riff on the futility exception to the exhaustion of remedies doctrine within ad-

arguments fail to recognize the significance of the petition process. The petition process strikes a delicate balance between judicial review, agency expertise and the public's right to a healthy, sustainable ecosystem which fosters biological diversity. The petition process sets up mandatory bright lines of both timing and behavior that are readily open to judicial review. *See* 16 U.S.C. § 1533(b)(3)(C)(ii).

The Plaintiffs or the Defendants cannot create a defacto petition process that ignores the legislative mandates found in the ESA. This attempt circumvents important safeguards, such as "best science available," timetables for agency action, and judicial review. The Plaintiffs did not avail themselves of the petition process, and thus cannot now claim the protections provided therein. This is a necessary result of this Court's limited jurisdiction under § 706(2)(A).

The other legislative mechanism that triggers the best science available mandate is the status review, contemplated by 50 C.F.R. § 424.21, which provides:

> At least once every 5 years, the Secretary shall conduct a review of each listed species to determine whether it should be delisted or reclassified. Each such determination shall be made in accordance with §§ 424.11, 424.16, and 424.17 of this part, as appropriate. A notice announcing those species under active review will be published in the Federal Register. Notwithstanding this section's provisions, the Secretary may review the status of any species at any time based upon a petition (see § 424.14) or upon other data available to the Service.

50 C.F.R. § 424.21.

The Plaintiffs argue that the Secretary was conducting this type of review, and thus triggered the "best science available" mandate. They claim that the decision rejecting the Wyoming Plan was part of a status review as reflected in the January 13, 2004 letter.

The Federal Defendants point out that a status review, as contemplated by the statutes and regulations, was conducted in 2003 and led to the eventual downlisting of the gray wolf from endangered to threatened. 68 Fed.Reg. 15,806–15,875. Thus, the Federal Defendants argue, the next status review mandated by statute is due to occur in 2008.

The Court is satisfied that the decision contained in the letter did not come in conjunction with a status review as mandated by the regulations.[17] Throughout the lengthy administrative record there is no mention of such a review taking place, and absolutely no citation to the regulation or statute which governs status reviews. The Plaintiffs' attempt to paint the Federal Agencies' actions as coming under a status review is unsupported by the record.

Simply put, the letter and the decision contained therein do not rest on a statutory or regulatory foundation. The letter is

---

ministrative law practice. *See generally Fox Television Stations, Inc. v. FCC,* 280 F.3d 1027 (D.C.Cir.2002) The Court does not believe that the metaphor is proper in this context because the petition process begins the administrative decision making process. It does not represent an additional mechanism to review decisions made by the agency. The Court also notes that the futility exception is a narrow one. *See Khader v. Aspin,* 1 F.3d 968 (10th Cir.1993)(holding that plaintiff's frustra-

tion and impatience do not justify immediate court action). While the decision of the Federal Agencies may be forgone, this Court's review of that decision is not.

**17.** Note that the only mandatory aspect of the status review provision is that one must take place every five years. It goes on to give the Secretary discretionary power to conduct a status review in accordance with a petition or other data available. *See* 50 C.F.R. § 424.21.

not the full determination of a status review. Nor is the letter an action taken pursuant to a petition to delist. Without such a basis, this Court cannot attach conditions or legal significance to the letter or the opinion it contains.

That is not to say that the Plaintiffs did not have expectations regarding the effect that promulgating the Wyoming Plan would have on the Federal Defendants' decision to delist the gray wolf. However, these expectations are irrelevant for the purposes of determining jurisdiction under the APA. This becomes evident when examined in light of the Supreme Court's jurisprudence related to estopping the government. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) (announcing the doctrine that the Government may not be estopped); *and Schism v. U.S.*, 316 F.3d 1259 (Fed.Cir. 2002), *cert. denied* 539 U.S. 910, 123 S.Ct. 2246, 156 L.Ed.2d 125 (2003). The State may have had expectations but they were not based on a legislative obligation to delist nor were they based on the affirmative misconduct of the agencies involved. *See generally Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990) (holding that the Government could be estopped with a showing of "affirmative misconduct"). This Court cannot review the actions of the Federal Defendants under § 706(2)(A) for failing to apply the best science available because the decision made by the agency did not implicate that statutory prerogative.

Furthermore, Wyoming argues that any delay in delisting of the gray wolf infringes upon Wyoming's sovereignty by preventing Wyoming from assuming management authority over the gray wolves in Wyoming.[18] This argument is problematic on several levels. The most obvious deficiency is that Wyoming's purported sovereignty in this area has been unmistakably preempted by Congress. *See Gibbs v. Babbitt*, 214 F.3d 483, 493 (4th Cir.2000), *cert. denied* 531 U.S. 1145, 121 S.Ct. 1081, 148 L.Ed.2d 957 (2001). Therefore, Wyoming's claim to sovereignty as to threatened or endangered species lacks legal foundation. Moreover, if there was some type of injury to Wyoming's sovereignty, it occurred on the date that the wolves traversed onto Wyoming land not upon receipt of the letter in question. Thus, the injury complained of flows not from the FWS's letter, but rather from the initial decision to release wolves back into the ecosystem-a valid exercise of Congress' power under the Commerce Clause.

The Plaintiff–Intervenors also argue that the delay of not delisting causes serious harm to the wild ungulate population and livestock because the Federal Defendants have failed to manage the gray wolf. This argument was also advanced by the State of Wyoming. This argument suffers from the same causation problem noted above; namely that the letter did not create the legal consequence complained of. *See* discussion below.

Nor could the letter be considered a consummation of the agency's decision making process. The Federal Defendants' decision making processes are clearly delineated in statute and regulation. *See* 50

---

18. The Plaintiff–Intervenors make a substantially similar argument. The Plaintiff–Intervenors claim that the FWS letter "prevents Wyoming from carrying out its statutory duties." The Wyoming statute purporting to take title to "all wildlife in Wyoming" is not paramount insofar as it relates to endangered and threatened species. However, that is a consequence of the Commerce Clause, and not the FWS's letter. Indeed, the "legal regime" has been altered, but this is a direct result of the Commerce Clause, the ESA and the Supremacy Clause, all of which contravene Wyoming's purported sovereignty to regulate endangered and threatened species. *See Gibbs*, 214 F.3d 483, 493.

C.F.R. § 424.14. The letter is not in response to a petition by the Plaintiffs, nor does it purport to establish a likely outcome of such a petition. The decision complained of by the Plaintiffs, while a product of deliberation, does not rise to the level of decision making that is contemplated by the APA, and thus reviewable as final agency action. *See City of Arcadia v. U.S. Environmental Protection Agency*, 265 F.Supp.2d 1142 (N.D.Cal. 2003).

The Plaintiffs have failed to show that the January 13, 2004 letter constituted final agency action and the Court does not have jurisdiction over the Plaintiffs' and Plaintiff–Intervenors' claims purportedly arising under the APA. *See Chemical Weapons Working Group, Inc. v. U.S. Dep't of the Army*, 111 F.3d 1485, 1494 (10th Cir.1997) (dismissal for lack of APA standing was correct since plaintiffs failed to explain how agency conduct was "agency action" under section 551(13)).

### (a) Agency Action Unreasonably Delayed or Unlawfully Withheld

### (i) Mandatory Duty to Delist the Gray Wolf

■ The Defendants claim that this Court does not have jurisdiction to hear the Plaintiffs' claims arising under the APA, specifically § 706(1), because the Defendants were not required to propose delisting of the gray wolves or control wolf depredation. The Defendants argue that § 706(1) can only be employed to enforce mandatory, nondiscretionary duties. That being the case, the Defendants argue that the ESA does not require the Defendants to approve the Wyoming Plan nor to propose delisting a species. The Defendants point out that they have complied with regulations requiring them to downlist or delist the gray wolf after three years of recovery. *See* 68 Fed. Register 15,804. The Plaintiffs contend that the Defendants

were under a mandatory duty to base their decision on delisting of the gray wolf, and thus their evaluation of the Wyoming Plan, on the "best scientific evidence" available.

In order to invoke jurisdiction under § 706(1), the Plaintiffs must demonstrate that the agency failed to perform an act that was legally required. *SUWA*, 124 S.Ct. at 2379. Section 706(1) "empowers a court to compel an agency to perform a ministerial or nondiscretionary act, or to take action upon a matter, without directing how it shall act." *Id.* (citations and internal quotation marks omitted). Thus, predicate to any action by this Court to compel agency action must be the Plaintiffs' establishment that the agency has unlawfully failed to act. As the Court remarked:

> [The] principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 124 S.Ct. at 2381.

Thus, "failure to act" means "that an agency has failed to take a discrete agency action that it is required to take." *Id.* at 2379. The policy behind this is clear, namely: "To protect agencies from undue

judicial interference with their lawful discretion and to avoid judicial entanglement." *Id.* at 2381. It is not the role of the courts to conduct a "general judicial review" of agency actions. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 899, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

The Plaintiffs' arguments misinterpret the mechanisms by which a species can be listed, delisted, or downlisted under the ESA. The letter sent by the FWS, indeed the entire process engaged in between the respective parties, does not have a coordinate statutory regime. The ESA provides for, essentially, three processes by which a species may have its status changed. The first and most obvious way is for the responsible agency to propose, through rulemaking procedures, that a species' status under the ESA be changed. *See* 50 C.F.R. § 424.10 ("The Secretary may add...."). Furthermore, an interested person may petition the responsible agency to add a species to the lists, delete a species from the lists or change the listed status of a species. *See* 50 C.F.R. § 424.14; *and* 5 U.S.C. § 553(e); *see also generally Hill v. Tennessee Valley Authority,* 549 F.2d 1064 (6th Cir.1977), *affd* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (superseded by statute as stated in *Board of Governors of Federal Reserve System v. Dimension Financial Corp.,* 474 U.S. 361, 106 S.Ct. 681, 88 L.Ed.2d 691 (1986)) *and* (superseded by statute on other grounds as stated in *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy* 898 F.2d 1410 (9th Cir.1990)) *and* (superseded by statute on other grounds as stated in *Pacific Rivers Council v. Thomas* 30 F.3d 1050 (9th Cir.1994)). Third, the Secretary must conduct a review of the status of species on the lists every five years pursuant to 16 U.S.C. § 1533(c)(2). *See e.g.* 68 Fed. Register 15,804.

As discussed above, the Federal Defendants have not proposed a change in status

for the gray wolves, nor have the Plaintiffs petitioned for a change in status. Simply put, there is no categorical imperative that commands the Secretary to propose that the gray wolf be delisted. Without a mandate to delist, the Court simply does not have jurisdiction to review the agency action in this case. *See generally SUWA.* Nor can this Court force the Federal Defendants to apply the "best science available" to actions that are not within the ESA's statutory scheme.

The "best science available" mandate written into the ESA does not control decisions of the Secretary until a change in status is proposed, either by the Secretary, or through the statutory petition mechanism-an action which has not been taken in this case. It seems that in this situation, the Defendants were simply investigating the possibility of proposing a rule that would eventually delist the gray wolf. In that scenario, 50 C.F.R. § 424.13 controls, which provides:

> When considering any revision of the lists, the Secretary shall consult as appropriate with affected States, interested persons and organizations, other affected Federal agencies, and, in cooperation with the Secretary of State, with the country or countries in which the species concerned are normally found or whose citizens harvest such species from the high seas. Data reviewed by the Secretary may include, but are not limited to scientific or commercial publications, administrative reports, maps or other graphic materials, information received from experts on the subject, and comments from interested parties.

Under this regulation, the Defendants should not be limited to the "best science available" when reviewing the data relevant to revising the lists. Nor does this

regulation provide that the Secretary must approve a state's management strategy.

Alternatively, the Plaintiffs argue that the Defendants have not complied with the ESA requirement to review the status of listed species, pursuant to 16 U.S.C. § 1533(c). The Plaintiffs argue that this review is mandatory, and thus a discrete action that the Defendants were required to take by law. This argument is not well taken. As discussed above, by all accounts, such a review was taken, and the Defendants did indeed change the status of the gray wolf in the western DPS from endangered to threatened. 68 Fed. Register 15,804 (April 1, 2003). A claim based on a status review would only become ripe in 2008, given the statutory mandate to review the status of listed species every five years. The Federal Defendant's were not compelled by statute or regulation to approve the Wyoming Plan, nor did the "best science available" mandate attach to their decision making process.

### (ii) Mandatory Duty to Control Wolf Depredations

The Plaintiff–Intervenors claim that jurisdiction over the Federal Defendants' alleged failure to manage wolf depredations is proper under § 706(1). The Federal Defendants claim that they are not under a mandatory duty to control gray wolf depredations.

In order to invoke jurisdiction under § 706(1), the Plaintiffs must demonstrate that the agency failed to perform an act that was legally required. *SUWA*, 124 S.Ct. at 2379. Section 706(1) "empowers a court to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." *Id.* (citations and internal quotation marks omitted). Thus, predicate to any action by this Court to compel agency action must be the Plaintiffs' establishment that the agency has

unlawfully failed to act. As the Court remarked:

[The] principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*SUWA*, 124 S.Ct. at 2381.

Thus, "failure to act" means "that an agency has failed to take a discrete agency action that it is required to take." *Id.* at 2379. The policy behind this is clear, namely: "To protect agencies from undue judicial interference with their lawful discretion and to avoid judicial entanglement." *Id.* at 2381. It is not the role of the courts to conduct a "general judicial review" of agency actions. *Lujan*, 497 U.S. at 899, 110 S.Ct. 3177.

The Plaintiff–Intervenors have failed to demonstrate that the Federal Defendants have a mandatory duty to control wolf depredations. The Court has examined the Plaintiff–Intervenors' reply brief very carefully and it is unable to find a reference to any regulation or statute that would create a non-discretionary duty requiring FWS to control depredations. In fact a review of the relevant regulations clearly demonstrates that the Federal De-

fendants are not mandated to control wolf depredations:

> (v) The Service, or agencies authorized by the Service, *may* promptly remove (place in captivity or kill) any wolf the Service or agency authorized by the Service determines to present a threat to human life or safety.

> \* \* \* \* \* \*

> (vii) The Service or agencies designated by the Service *may* take wolves that are determined to be "problem" wolves.

> \* \* \* \* \* \*

> (ix) Service or other Federal, State, or tribal personnel *may* receive written authorization from the Service to take animals under special circumstances. Wolves may be live captured and translocated to resolve demonstrated conflicts with ungulate populations or with other species listed under the Act, or when they are found outside of the designated experimental population area. Take procedures in such instances would involve live capture and release to a remote area or placement in a captive facility, if the animal is clearly unfit to remain in the wild. Killing of wolves will be a last resort and is only authorized when live capture attempts have

failed or there is clear endangerment to human life.

> (xi) Any employee or agent of the Service or appropriate Federal, State, or tribal agency, who is designated in writing for such purposes by the Service, when acting in the course of official duties, *may* take a wolf from the wild within the experimental population area. . .

50 C.F.R. §§ 17.84(i)(3)(v), (vii), (ix) and (xi)(emphasis added).

Frankly put, the Plaintiff–Intervenors have not demonstrated that the Federal Defendants are under a discrete non-ministerial duty to control the depredations. The only arguably mandatory actions that FWS must take are related to "chronic problem wolves." *See* 50 C.F.R. § 17.84(i)(3)(vii).[19] That is not to say that the Federal Defendants do not have the authority to control wolf depredations. However, the authority granted to the Federal Defendants is discretionary in nature. The regulations clearly demonstrate a legislative choice to create discretion on how to deal with the gray wolf depredation and human-wolf conflicts.[20] As such, this Court lacks jurisdiction over these claims pursuant to the APA. *See SUWA; and 5*

**19.** "All chronic problem wolves (wolves that deprecate on domestic animals after being moved once for previous domestic animal depredations) will be removed from the wild (killed or placed in captivity)." 50 C.F.R. § 17.84(i)(3)(vii). Note that three criteria must be met before a wolf is considered a "problem wolf," specifically: "(A) There must be evidence of wounded livestock or partial remains of a livestock carcass that clearly shows that the injury or death was caused by wolves. Such evidence is essential since wolves may feed on carrion which they found and did not kill. There must be reason to believe that additional livestock losses would occur if no control action is taken[;] (B) There must be no evidence of artificial or intentional feeding of wolves. Improperly disposed of livestock carcasses in the area of depredation

will be considered attractants. Livestock carrion or carcasses on public land, not being used as bait under an agency authorized control action, must be removed or otherwise disposed so that it will not attract wolves[;][and] (C) On public lands, animal husbandry practices previously identified in existing approved allotment plans and annual operating plans for allotments must have been followed." 50 C.F.R. § 17.84(i)(3)(vii)(A-C).

**20.** By their very nature the gray wolf preys on other animals for survival, and at times the gray wolf preys on livestock. This result is fully contemplated by the regulations, namely that there will be depredations. 50 C.F.R. § 17.84(i)(3)(ii). How these depredations are mitigated, however, is left to the expertise and sound discretion of the FWS.

U.S.C. § 706(1). The Plaintiffs' and Plaintiff–Intervenors' complaint are really broad programmatic attacks on how the Federal Defendants are exercising their discretionary authority. This type of claim is not cognizable under the APA. *See SUWA,* 124 S.Ct. at 2379–2380 ("The limitation to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)."). As the Court noted in *SUWA:*

> The limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law). Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be. For example, 47 U.S.C. § 251(d)(1) [47 USCS § 251(d)(1) ], which required the Federal Communications Commission "to establish regulations to implement" interconnection requirements "[w]ithin 6 months" of the date of enactment of the Telecommunications Act of 1996, would have supported a judicial decree under the APA requiring the prompt issuance of regulations, but not a judicial decree setting forth the content of those regulations.

*SUWA,* 124 S.Ct. at 2380.

Without a mandate the Plaintiff–Intervenors cannot assert a reviewable claim under 5 U.S.C. § 706(1).

#### b. NEPA Claims

■ The Plaintiff–Intervenors argue that the Federal Defendants have violated their duties under NEPA to supplement the environmental impact statement (EIS) for the original agency action analyzed in the final EIS (FEIS) pertaining to the 1994 rule which adopted the Western Recovery Plan for the gray wolf. The Plaintiff–Intervenors assert that the Federal Defendants have never taken the requisite "hard look" at the environmental consequences of their demand that the gray wolf be protected throughout the State of Wyoming.

The Federal Defendants argue that they completed the FEIS as part of the 1994 Rule and that is all that is required under NEPA. The Defendants contend that there is no ongoing obligation for the Federal Government to supplement an FEIS every time new information emerges. The Defendants assert that the federal regulations related to NEPA simply require that an FEIS be available before decisions are made and before actions are taken. Thus, the Defendants argue that after reintroduction of the gray wolf has taken place, no other federal action is left to occur. The Defendants urge the Court to follow *SUWA.* In *SUWA* the Court held that supplementation under NEPA is "necessary only if there remains major Federal action to occur[.]" *SUWA,* 124 S.Ct. at 2385 (internal quotations marks omitted)(quoting *Marsh v. Oregon Natural Resources Council et al.,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). The Federal Defendants conclude that after the 1994 Rule was promulgated, there remains no more "major federal action" to take place.[21] The Court agrees.

■ Those seeking to enforce procedural requirements under NEPA must rely on the APA; NEPA (unlike the ESA) confers no private right of action. *Committee to*

---

21. The Federal Defendants also claim that the Plaintiff–Intervenors' allegations of a NEPA violation are barred by the civil action statute of limitation because the claim was not made within six years after the right of action first accrues. *See* 28 U.S.C. § 2401(a).

*Save the Rio Hondo v. Lucero,* 102 F.3d 445, 447. (10th Cir.1996). The Plaintiff–Intervenors must therefore satisfy the "statutory standing" requirements of the APA. *Utah v. Babbitt,* 137 F.3d 1193, 1203 (10th Cir.1998). Specifically, they must establish that Defendants took "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704; *Lujan,* 497 U.S. at 882, 110 S.Ct. 3177; *and Colorado Farm Bureau Fed'n,* 220 F.3d at 1173.

The Plaintiff–Intervenors have failed to establish that the there has been a final agency action in this case which would implicate NEPA. As discussed above, the January 13, 2004 letter does not constitute final agency action for the purposes of the APA. The Plaintiff–Intervenors' additional claim that the "[Federal] Defendants' demand that the State of Wyoming adopt a plan for the purpose of protecting the gray wolf population outside of the Yellowstone Recovery Area" is not supported by the record. The Plaintiff–Intervenors are attempting to manipulate the actions of the Federal Defendants into a NEPA claim. The only action taken by the Federal Defendants was to inform the State of Wyoming that the Wyoming Plan was insufficient, in their opinion, to sustain the recovered gray wolf population.

Plaintiff–Intervenors have failed to meet their burden of identifying a "final agency action" as defined in section 551(13) for us to review. They therefore lack the statutory standing required to bring this claim under the APA. *See, e.g., Chemical Weapons Working Group, Inc.,* 111 F.3d at 1494 (dismissal for lack of APA standing was correct since plaintiffs failed to explain how agency conduct was "agency action" under section 551(13)). Assuming, *arguendo,* that the Plaintiff–Intervenors have alleged a final agency action under the APA, their claim still fails under the rule announced in *SUWA.*

■ NEPA requires a federal agency to prepare an *initial* environmental impact statement as part of any "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." *See* 42 U.S.C. § 4332(2)(C). As the Court cited in *SUWA:*

> Often an initial EIS is sufficient, but in certain circumstances an EIS must be supplemented. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 370–374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). A regulation of the Council on Environmental Quality requires supplementation where "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 CFR § 1502.9(c)(1)(ii) (2003). In *Marsh,* we interpreted § 4332 in light of this regulation to require an agency to take a "hard look" at the new information to assess whether supplementation might be necessary.

*SUWA,* 124 S.Ct. at 2384 (citations partially omitted).

As the Court intimates above, requirements for a supplemental EIS are controlled by 40 C.F.R. § 1502.9(c)(1)(i)-(ii), which provides:

> (c) Agencies:
>
> (1) Shall prepare supplements to either draft or final environmental impact statements if:
>
> > (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
> >
> > (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

The Plaintiffs–Intervenors' contentions that the Federal Defendants need to supplement the EIS because the range of the wolf is being increased does not implicate the types of major actions contemplated by NEPA. *Compare Marsh* (building a dam). Nor does their assertion comport with the regulation promulgated for wolf reintroduction, Section 17.84(i)(7)(ii) provides, in pertinent part that: "The boundaries of the nonessential experimental population area will be…all of Wyoming." 50 C.F.R. § 17.84(i)(7)(ii). If any NEPA violation occurred then it was at the inception of the wolf reintroduction, not at this stage in the program.

Furthermore, the Plaintiff–Intervenors conflate the concepts of what is required for an initial EIS under NEPA and what circumstances are required for supplementation. The Plaintiff–Intervenors cite to *Holy Cross Wilderness Fund v. Madigan,* 960 F.2d 1515 (10th Cir.1992), for the proposition that:

> Under NEPA, "major Federal actions significantly affecting the quality of the human environment" must be preceded by an environmental impact statement or EIS. 42 U.S.C. 4332(2)(C). *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348–49, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *City of Aurora v. Hunt,* 749 F.2d 1457, 1464 (10th Cir. 1984); *Johnston v. Davis,* 698 F.2d 1088, 1091 (10th Cir.1983). The EIS requirement serves two important functions:

> It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Holy Cross Wilderness Fund,* 960 F.2d at 1521.

However, that section of the opinion deals with what is needed for an initial EIS and has no bearing on the requirements for a supplemental EIS. Plaintiff–Intervenors' assertion that the Federal Defendants must supplement the FEIS to determine what effect the protection of the wolves throughout the State of Wyoming will have on the "quality of the human environment" is simply the wrong standard to apply.

■ An agency does not have to supplement an EIS or an EA "every time new information comes to light." 490 U.S. at 373, 109 S.Ct. 1851; *Friends of the Bow,* 124 F.3d at 1218 (quoting *Marsh* ). "To require otherwise," the Supreme Court has observed, "would render agency decision making intractable, always awaiting updated information only to find new information outdated by the time a decision is made." *Marsh,* 490 U.S. at 373, 109 S.Ct. 1851. Instead, "the issue is whether the subsequent information raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary." *Wisconsin v. Weinberger,* 745 F.2d 412, 418 (7th Cir. 1984); *see also S. Trenton Residents Against 29 v. Fed. Highway Admin.,* 176 F.3d 658, 663–64 (3d Cir.1999) (same).

If the Wolf Coalition's argument is that the FEIS preparation for the 1994 Rule is inadequate, then it is surely barred by the statute of limitations discussed below. However, if their argument is that the FEIS for the 1994 Rule needs to be supplemented, then the Court needs to focus its attention on that standard. For supplementation, there needs to remain "major federal action to occur." *See SUWA,* 124 S.Ct. at 2385. The Plaintiff–Intervenors argue that the Federal Defendants' demand that Wyoming adopt specifically-

designed protections for the sole purpose of securing the gray wolf population in areas of the State that the Federal Defendants previously concluded "were undesirable" satisfies the major federal action requirement.

A survey of what various courts have concluded to be "major federal action" is instructive. The plaintiffs in *SUWA* contended that BLM had not fulfilled its obligation under NEPA to supplement the EIS to take increased off-road vehicle use into account. In *SUWA* the Court concluded that once BLM approved a land use plan major federal action came to an end and there was no obligation to supplement. *See SUWA*, 124 S.Ct. at 2385. In making its conclusion, the Court held that since BLM's approval of the land use plan was the action that required the initial EIS, and since that plan had already been approved, there was no ongoing federal action that could require supplementation. *Id.*

The Federal Defendants assert that *SUWA* is analogous to this case. Specifically, the 1994 Rule for reintroduction of the wolves was the reason for the FEIS, and that once the rule was finalized there remained no further action. This is a similar situation to BLM's approval of the land use plan. Once the land use plan went into effect, the need for supplementation of the EIS was at an end. The Court agrees that the situation in *SUWA* is analogous. In the instant case, once the reintroduction plan went into effect the need for supplementation was at an end. Shifting the responsibility of management of the gray wolf recovery from the Federal Government to Wyoming is not a "major federal action" as contemplated by NEPA.

■ The Court also notes that the Plaintiff–Intervenors' claims under NEPA are barred by the statute of limitations for actions against the United States. 28 U.S.C. § 2401(a) provides in pertinent part: "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues[.]" Simply put, the Plaintiff–Intervenors are bringing a decade old claim now. Furthermore, the Court is satisfied that there remains no further major federal action to take place, as defined in *SUWA* in this case, and thus the Plaintiff–Intervenors' claims under NEPA are not properly before the Court.

### c. Plaintiffs' Claims Arising Under the Guarantee Clause and Tenth Amendment of the United States Constitution

The Plaintiffs claim that the letter FWS sent on January 16, 2004, amounts to a violation of both the Guarantee Clause and the Tenth Amendment of the United States Constitution. The Plaintiffs argue that FWS's demand that the Wyoming Legislature enact a specific regulatory scheme is unconstitutional. The Plaintiffs rely on the Supreme Court's opinion in *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

The Plaintiffs assert that FWS is attempting to commandeer the legislative processes of Wyoming by demanding that Wyoming change its wolf management plan to comport with the ESA. The Plaintiffs argue that the Federal Defendants are motivated by their concern for "political correctness." Furthermore, the Plaintiffs argue, Wyoming has asserted its legislative prerogative that "there are areas of Wyoming where wolves should not exist." The Plaintiffs claim that the threat posed in the instant case, unregulated depredation of livestock and wild ungulates, is of greater concern to Wyoming than was the disposal of low-level radioactive hazardous waste by-products to New York. The Plaintiffs point out that in *New York* the Court stated that the threat that

the State might miss out on a share of federal funds "d[id] not pose any realistic risk of altering the form or the method of functioning" of the State's government. The Plaintiffs urge us not to come to the same conclusion as the Supreme Court.

The Defendants counter by arguing that the Plaintiffs have failed to offer a justiciable issue under the Tenth Amendment or the Guarantee clause of the Constitution. The Defendants argue that if a justiciable issue has been raised, the Plaintiffs' claims fall well short of the standards announced by the Supreme Court.

In *New York*, New York State and two of its counties filed suit against the United States seeking declaratory relief that three incentive provisions within the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b *et seq.* (the Act) were inconsistent with the Tenth Amendment and the Guarantee Clause. The Tenth Amendment provides in pertinent part: "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States." The Guarantee Clause of Article IV, § 4, provides that the United States shall "guarantee to every state . . . a Republican Form of Government." The Act called on the various states to enact legislation to deal with the anticipated shortage of waste storage sites. The incentives complained of by New York included monetary incentives, access incentives, and a take title incentive.

The monetary incentive allowed states with disposal sites to impose surcharges on radioactive waste received by other states. A portion of these surcharges were collected by the Secretary of Energy and placed in an escrow account. These collections held in escrow were then refunded to States that achieved certain milestones in developing sites to receive waste. The access incentives authorized states and regional compacts with disposal sites to in-

crease the costs of access to those sites, and then deny access altogether to states that had not complied with provisions of the Act. The third incentive was known as the take title provision. This provision forced states that had not complied with the Act (providing for the disposal of all internally generated waste) to take title and possession of the waste. The Act also provided that once the state had taken title that they were then liable for all damages that resulted from the states' failure to take possession of the waste.

The Supreme Court held that the monetary incentives and the access incentives were consistent with the Tenth Amendment. The Court, however, ruled that the take title provision was inconsistent with the Tenth Amendment. The Court took issue with the take title provision, because it "commandeer[ed] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *New York*, 505 U.S. at 161, 112 S.Ct. 2408 (citations omitted). The Court found that Congress had impermissibly compelled States to enact legislation to take title-an act that went beyond the powers granted to the National Legislature through Article I. In reaching its conclusion, however, the Court expressly discussed Congress' ability to encourage state participation in regulatory programs:

> This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a method of influencing a State's policy choices. Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests.

*New York*, 505 U.S. at 166, 112 S.Ct. 2408.

The Supreme Court identified two permissible ways that Congress may encour-

age States to enact regulatory regimes consistent with the prerogative of the National Legislature. The first method involved a *quid pro quo*, whereby Congress may attach conditions on the receipt of federal funds. *Id.* The Court also recognized "Congress' power to offer States the choice of regulating [ ] activity according to federal standards or having state law pre-empted by federal regulation." *Id.* The Supreme Court held that: "By either of these methods, as by any other permissible method of encouraging a State to conform to federal policy choices, the residents of the State retain the ultimate decision as to whether or not the State will comply." *Id.* at 168, 112 S.Ct. 2408.

The Supreme Court more fully defined what it meant to commandeer a state's legislative processes in *Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). The Court held that "commandeering is...an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defects." *Condon,* 528 U.S. at 150, 120 S.Ct. 666. With these principles in mind the Court now examines the Plaintiffs' claims.

■■■ It is well settled that the ESA is a Constitutional exercise of Congressional authority under the Commerce Clause. *See Rancho Viejo, LLC v. Norton,* 323 F.3d 1062 (C.A.D.C.2003), *reh'g denied, reh'g en banc denied* 334 F.3d 1158. Wyoming claims that the instant case is analogous to *New York* in that the Federal Defendants have offered two choices: (1) change Wyoming law to eliminate the predator classification for wolves, commit to maintaining at least fifteen packs by making wolves trophy game statewide, and

change the definition of pack to six or more wolves traveling together in winter, or (2) the gray wolf will not be delisted and Wyoming will continue to suffer harm to its wildlife resources and its ability to exercise its "sovereign powers" to manage wildlife in Wyoming. Wyoming has failed to demonstrate a claim arising under the Tenth Amendment.

First, any Tenth Amendment claim must establish that Congress has legislated outside its enumerated powers. *New York,* 505 U.S. at 156, 112 S.Ct. 2408. If the Constitution empowers Congress to exercise management and preservation of endangered species through its power to regulate interstate commerce, "the Tenth Amendment expressly disclaims any reservation of that power to the States." *Wyoming v. U.S.,* 279 F.3d 1214, 1226 (10th Cir.2002)(quoting *New York,* 505 U.S. at 156, 112 S.Ct. 2408). Wyoming has simply failed to show how Congress has violated the State's reserved powers by regulating the gray wolves via the ESA. Nor has Wyoming shown how the Federal Defendants have commandeered the States' legislative processes. Even using Wyoming's characterization of the choices it faces does not evidence a cognizable claim under the Tenth Amendment. Indeed, the Federal Defendants have spelled out what they believe is necessary for a successful delisting of the gray wolf. Wyoming will suffer pre-emption of that regulation if it chooses to do nothing. Neither choice is unconstitutional on its face. *See New York,* 505 U.S. at 176, 112 S.Ct. 2408 ("A Choice between two unconstitutionally coercive regulatory techniques is no choice at all.").

Wyoming is under no mandate to regulate gray wolves. The letter sent to Wyoming critiquing the Wyoming Plan does not carry the force of law with it-Wyoming is free to ignore it. But such an action is

not without consequences. If Wyoming chooses to ignore the letter and the critiques contained therein, the State simply will find itself perpetually pre-empted from regulating the gray wolf.[22] Compare that result with the take title provision in *New York:*

> the take title incentive does not represent the conditional exercise of any congressional power enumerated in the Constitution. In this provision, Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction.

*New York,* 505 U.S. at 176, 112 S.Ct. 2408.

The Federal Defendants urge us to follow the holdings in *Hodel* and *FERC v. Mississippi,* 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). The Federal Defendants argue that those cases stand for the proposition that Congress can enumerate federal minimum standards that allow the States to meet their particular needs. This concept is known as "cooperative federalism." While the Court feels these cases are instructive, the crux of the issues can be more than adequately addressed within the analytical framework presented in *Condon* and *New York.* That being said, the Court does not disagree with the Federal Defendants' reading of those cases, and agrees that the ESA does create minimum standards to which Wyoming must adhere. *See e.g.* 50 C.F.R. § 424.13. The Federal Defendants have simply given Wyoming a roadmap by which it can navigate between the frontiers of the often contentious delisting process.

The Federal Defendants have offered the State a permissible *quid pro quo,* namely that Wyoming establish a wolf management plan that comports with the ESA, or the Federal Defendants, though the ESA will continue to pre-empt Wyoming's regulation of the gray wolf. This is exactly the type of encouragement deemed permissible by the Supreme Court in *New York. See New York,* 505 U.S. at 168, 112 S.Ct. 2408; and *Condon,* 528 U.S. at 150–151, 120 S.Ct. 666; *and Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Wyoming's characterization of the Federal Defendant's actions as being politically motivated, and an attempt to foist "political correctness" on the people of Wyoming is neither a recognizable argument, nor does it have any place in a Tenth Amendment analysis. The Court reiterates the Supreme Court's admonition to the States: "Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Condon,* 528 U.S. at 150–151, 120 S.Ct. 666 (citations omitted).

The Court notes as well that the alleged harm being suffered by Wyoming, i.e. the Federal Defendants' failure to regulate gray wolf depredations, is entirely speculative and unproven at this stage of litigation. Furthermore, the Tenth Circuit has plainly held that while the States have historically possessed broad powers over wildlife within their borders, such powers are not constitutionally based-and thus are susceptible to pre-emption. *See Wyoming v. United States of America,* 279 F.3d 1214, 1226–1227 (citing *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)). Wyoming has failed to demonstrate an unlawful *ultra vires* action

---

**22.** This assumes that any petition that Wyoming may submit to the FWS to delist the gray wolf would be validly denied-a course of action that Wyoming has not taken.

by the National Legislature in its regulation of the gray wolves, nor has Wyoming shown that the Federal Defendants in this case have commandeered the legislative processes of Wyoming. The Federal Defendants' actions are entirely consistent with the Tenth Amendment.

The Court also notes that a properly styled Tenth Amendment argument alleging that the Federal Defendants, and therefore Congress, is powerless to regulate gray wolves via the ESA on private or State lands because such regulation violates the Commerce Clause is meritless. Time and again the courts of the United States have upheld the regulatory powers of Congress under the Commerce Clause; woe be the court that deviates from this broad and well defined concept of Article I powers. *See Gibbs*, 214 F.3d at 492 (holding that regulation of red wolves on private property is consistent with the Commerce Clause). This assertion holds true even post *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Simply put, no court of the United States has invalidated any ESA regulation for exceeding the powers delegated to Congress by the Commerce Clause.

■ Wyoming urges the Court to apply *New York's* analysis of constraints to the National Legislature contained in the Guarantee Clause, which cites:

> Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command. The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate. The twin threats imposed by the first two challenged provisions of the Act—that New York may miss out on a share of federal spending or that those generating radioactive waste within New York may lose out-of-state disposal outlets—do not pose any realistic risk of altering the form or the method of func-

tioning of New York's government. Thus even indulging the assumption that the Guarantee Clause provides a basis upon which a State or its subdivisions may sue to enjoin the enforcement of a federal statute, petitioners have not made out such a claim in these cases. *New York*, 505 U.S. at 185–186, 112 S.Ct. 2408.

Wyoming claims that the FWS violated the Guarantee Clause when it "directly order[ed] the Wyoming Legislature to pass specific legislation," thus, abrogating Wyoming's "ability to set [its] legislative agenda" or that "state government officials remain accountable to the local electorate." *New York*, 505 U.S. at 185, 112 S.Ct. 2408. Wyoming further argues that FWS's ultimatum to the Wyoming legislature to pass certain laws or the wolf would not be delisted posed a realistic risk of altering the form or method of functioning of Wyoming's government. *See Id.* at 186, 112 S.Ct. 2408. Wyoming asserts that the unregulated and marauding wolves are "decimating" the livestock and wild ungulate population, thus posing a threat to Wyoming's ability to manage any of its wildlife, and detrimentally affecting Wyoming's tax revenue from licensing and sales of sporting goods.

The Federal Defendants argue that assuming a claim is justiciable under the Guarantee Clause and in order to make a valid claim, the offending behavior must fundamentally restructure the form of the state government. The Federal Defendants point out that Wyoming is actually complaining about the effect that the ESA has on constraining its authority to regulate listed species and thus is more properly styled under a Tenth Amendment claim, and thus should be dismissed.

The Guarantee Clause of the United States Constitution provides that "the United States shall guarantee to every

State in this Union a Republican Form of Government...." U.S. Constitution, Art. IV § 4. In search of an analytical model on which to discuss Wyoming's claims, the Court first consults the words of the framers. In Federalist No. 43, Madison wrote to the people of New York:

> In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchial innovations. The more intimate the nature of such a union may be, the greater interest have the members in the political institutions of each other; and the greater right to insist that the forms of government under which the compact was entered into should be SUBSTANTIALLY maintained. But a right implies a remedy; and where else could the remedy be deposited, than where it is deposited by the Constitution? Governments of dissimilar principles and forms have been found less adapted to a federal coalition of any sort, than those of a kindred nature. "As the confederate republic of Germany," says Montesquieu, "consists of free cities and petty states, subject to different princes, experience shows us that it is more imperfect than that of Holland and Switzerland." "Greece was undone," he adds, "as soon as the king of Macedon obtained a seat among the Amphictyons." In the latter case, no doubt, the disproportionate force, as well as the monarchical form, of the new confederate, had its share of influence on the events. It may possibly be asked, what need there could be of such a precaution, and whether it may not become a pretext for alterations in the State governments, without the concurrence of the States themselves.
>
> These questions admit of ready answers. If the interposition of the general government should not be needed, the provision for such an event will be a harmless superfluity only in the Constitution. But who can say what experiments may be produced by the caprice of particular States, by the ambition of enterprising leaders, or by the intrigues and influence of foreign powers? To the second question it may be answered, that if the general government should interpose by virtue of this constitutional authority, it will be, of course, bound to pursue the authority. But the authority extends no further than to a GUARANTY of a republican form of government, which supposes a pre-existing government of the form which is to be guaranteed. As long, therefore, as the existing republican forms are continued by the States, they are guaranteed by the federal Constitution. Whenever the States may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter. The only restriction imposed on them is, that they shall not exchange republican for anti-republican Constitutions; a restriction which, it is presumed, will hardly be considered as a grievance.

The Federalist No. 43 (James Madison) (emphasis in original).

Madison's clarity of the purpose behind the Guarantee Clause is blinding. Plainly Madison believed that the Guarantee Clause was necessary to ensure that the States themselves would not devolve into less than democratic forms of government. His point is well taken that governments bound together into a federal system must share similar systems of governance, namely republican democracies.

Madison contends that the "general government should interpose by virtue of this constitutional authority[.]" *Id.* It seems then that the remedy flows to the general government to ensure that the States do not enact "anti-republican" forms of gov-

ernment. In this sense Wyoming's suit against the United States claiming usurpation of its republican form of government is not a remedy that it can enforce under the Guarantee Clause. This view would substantially limit the scope of the Guarantee Clause. However, the Court is not blind to the interpretations of the Guarantee Clause, and its evolution.

The first major case dealing with the Guarantee Clause was *Luther v. Borden.*[23] In that case Chief Justice Tawney determined that the question as to who properly represented the lawful government of Rhode Island was non-justiciable as it was a political question. The holding that emerged was that the Guarantee Clause itself was non-justiciable. Modernly, the question of whether the Guarantee Clause is justiciable is less clear. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)(holding that a reapportionment case is not foreclosed from judicial review if it is based on the Equal Protection Clause rather than the Guarantee Clause); *cf. Coyle v. Smith,* 221 U.S. 559, 565, 31 S.Ct. 688, 55 L.Ed. 853 (1911)(holding that Congress cannot tell a state where to locate its capital). For our purposes, the *obiter dicta* in *New York* regarding the Guarantee Clause is instructive.

In *New York* the Court opined that the Guarantee Clause may foreclose Congressional mandates to the States if those mandates upset a state's ability to set its legislative agendas so that state government officials remain accountable to the local electorate, or if the mandates pose a realistic risk of altering the form or method of the state's functioning government. *See New York,* 505 U.S. at 185–186, 112 S.Ct. 2408. Thus, insofar as the Guarantee

Clause is a check on the power of the Federal Government, it is only a relief valve for the most extreme examples of Congressional usurpation of a state's governmental processes.[24]

Here there has been no such action by the National Legislature, *a fortiori,* FWS. The mandates complained of by Wyoming flow from the authority of Congress via the Commerce Clause. This authority spawned the ESA, a valid exercise of Congressional legislation. The mandates complained of by Wyoming are not mandatory. As discussed above, FWS through the ESA has simply given Wyoming conditions by which it could take over the management of the gray wolves. Wyoming is free not to accept those conditions, however, the consequence is continued pre-emption. The actions under the ESA do not endanger Wyoming's legislative prerogative, nor do they risk altering the form or method of functioning of Wyoming's government.

In sum, the challenged actions of the Federal Defendants are consistent with the powers delegated to them by Congress through the ESA via the Commerce Clause, and these actions do not invade any province of Wyoming's state sovereignty reserved by the Tenth Amendment.

## Conclusion

Therefore, this Court lacks jurisdiction to review the Plaintiffs' and Plaintiff–Intervenors' claims under the § 706(2) of the APA because the Plaintiffs have failed to demonstrate that the January 13, 2004 letter constituted final agency action for the purposes of the APA. Furthermore, neither the Plaintiffs nor the Plaintiff–Intervenors can assert jurisdiction under § 706(1) because they have failed to estab-

---

**23.** 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849).

**24.** The only example that would fit this model that comes to mind would be the Federal Government arresting pro-confederate mem-

bers of the Maryland General Assembly in 1861. *See* http://www.mdarchives.state.md.us/msa/stagser/s1259/121/7590/html/0000.html

lish that the Federal Defendants have a mandatory duty to delist the gray wolf, or lack discretion as to management of the wolf depredations. Thus, the Court cannot review the claims that the Federal Defendants have violated the ESA. Under the analysis provided above, neither the Plaintiffs nor the Plaintiff–Intervenors have succeeded on the merits of any of their claims in this litigation because § 706 of the APA does not provide any basis for this Court to set aside or compel agency action under these circumstances.

The Court is at a loss to explain the actions of the State of Wyoming. The statutory mechanisms, namely the petition process, are in place for the State to create a reviewable record. This action, if it had been taken, would have forced the Federal Defendants to make choices under hard deadlines set by Congress. It would have also triggered the "best science available" mandate, and much of the Federal Defendants' arguments presented here would have melted away, allowing this Court to reach the merits of many of Wyoming's claims. The statutory requirements are not mere bureaucratic hoops to jump through, but rather are the stated will of Congress, and the people, and as such should be adhered to with great care.

This case touches the heart of federalism. The complaints filed here are not cognizable under the limited jurisdiction of this Court. This does not mean that the Court is not sympathetic to the claims being made, however, the arguments brought to this Court are more appropriately laid at the feet of the Wyoming Congressional delegation.[25] This Court is not in the position to step into the shoes of the Secretary of the Interior and begin administrating the Endangered Species Act. Nor is this Court in a position to micro-manage the Fish and Wildlife Service's authority to manage the gray wolf population. This Court does not represent either the legislative or executive powers, and therefore cannot in good faith craft the type of relief prayed for by the Plaintiffs and Plaintiff–Intervenors.

Accordingly, and for the foregoing reasons it is hereby

**ORDERED** that the Plaintiffs' and Plaintiff–Intervenors' prayers for injunctive relief pursuant to 5 U.S.C. §§ 706(1), (2) are **DENIED**. It is further

**ORDERED** that Plaintiffs' prayer for injunctive relief pursuant to the Tenth Amendment and Guarantee Clause of the United States Constitution is **DENIED**. It is further,

**ORDERED** that the Plaintiffs' and Plaintiff–Intervenors' prayers for declaratory relief are **DENIED**. It is further

**ORDERED** that Plaintiffs' and Plaintiff–Intervenors' claims under 16 U.S.C. § 1533 *et seq.*(ESA) are **DISMISSED**. It is further

**ORDERED** that the Plaintiff–Intervenors' claims under 42 U.S.C. § 4321 *et seq.* (NEPA) are **DISMISSED**. It is further

**ORDERED** that the above captioned case be **DISMISSED WITHOUT PREJUDICE** in its entirety.

---

**25.** The Court notes that Governor Freudenthal intends to address Wyoming's concerns regarding the ESA to the Federal Government. *See http://www.casperstartribune.net/articles/2005/03/0 1/news/wyoming/ba0e9662a93fa11b87256fb600695b88.txt.*